UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERNARD L., <br><br> Plaintiff, <br><br> v. <br><br> MICHELLE KING, <br> ACTING COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 22 CV 00120 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bernard L. brings this action for judicial review of the portion of the Social Security Administration's (SSA) decision denying his application for benefits for the period from October 16, 2012 to April 3, 2013. For the following reasons, plaintiff's request to reverse the SSA's decision [15][2] is denied, defendant's motion for summary judgment [16] is granted, and the decision denying the application for benefits for the period of October 16, 2012, to April 3, 2013, is affirmed.

**Background**

On May 10, 2013, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of October 16, 2012. [10-1] 15; [10-2] 1340. Plaintiff's claims were denied initially on July 16, 2013, and upon reconsideration on March 28, 2014. [10-1] 15. Plaintiff requested a hearing, which was held on December 9, 2015 before administrative law judge (ALJ) Kadlec. [*Id.*] 15, 39–90. On February 17, 2016, ALJ Kadlec issued an unfavorable decision finding plaintiff not disabled. [*Id.*] 15–33. The Appeals Council denied review on March 2, 2017, and plaintiff appealed to the Northern District of Illinois. [*Id.*] 1; [10-2] 1056–57. On November 17, 2017, on the Commissioner's agreed motion, the District Court remanded for further administrative proceedings. [10-2] 1052–55.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Michelle King, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Martin O'Malley.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [10], which refer to the page numbers in the bottom right corner of each page.

On April 11, 2018, the Appeals Council vacated the final decision and remanded to an ALJ. [10-2] 1075–77. The Appeals Council also noted that plaintiff had filed a subsequent claim for Title II disability benefits on May 22, 2017 and the state agency had determined that plaintiff was disabled as of February 18, 2016. [*Id.*] 1076. The Appeals Council affirmed this determination but found that the period prior to February 18, 2016 required further adjudication. [*Id.*] 1076–77. A second, supplemental hearing was held before ALJ Kadlec on September 25, 2018. [*Id.*] 943, 969–1022. On December 3, 2018, ALJ Kadlec issued a decision finding plaintiff disabled as of June 26, 2015 but not disabled prior to that date. [*Id.*] 942–61. The Appeals Council denied further review and plaintiff appealed again to the District Court. [*Id.*] 1427. On November 30, 2020, this Court reversed the agency's decision and remanded for further administrative proceedings. [*Id.*] 1427–41. On March 11, 2021, the Appeals Council affirmed the prior finding that plaintiff was disabled as of June 26, 2015 and remanded to an ALJ for review of the period prior to June 26, 2015, *i.e.*, October 16, 2012 through June 25, 2015. [*Id.*] 1442–44.

A hearing was held before ALJ Ellis on June 16, 2021. [10-2] 1340, 1363–83. In a decision dated June 30, 2021, the ALJ found that plaintiff was not disabled prior to April 4, 2013, but became disabled on that date and continued to be disabled through the date of the decision. [*Id.*] 1340–53. The Appeals Council denied review on November 3, 2021, [*id.*] 1328–29, rendering the ALJ's decision the final decision of the Commissioner. [*Id.*] 1–4. *See* 20 C.F.R. §§ 404.955 & 404.981; *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021). Plaintiff timely appealed to this Court [1], and the Court has subject-matter jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[3]

## Legal Standard

In evaluating a claim for disability benefits, ALJs follow a five-step, sequential process. *Apke v. Saul*, 817 F. App'x 252, 255 (7th Cir. 2020). The ALJ must evaluate the following:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner] …; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (alterations in original) (quoting *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). *See also* 20 C.F.R. § 404.1520. The claimant bears the burden of proof at steps one through four. *Fetting*, 62 F.4th

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge [6].

at 336 (citing *Clifford*, 227 F.3d at 868). "At step five, the burden shifts to the agency to show that 'there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations.'" *Id.* at 336–37 (quoting *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (citing 20 C.F.R. § 416.960(c)(2)).

When the Appeals Council denies a plaintiff's request for review, the ALJ's decision constitutes the final decision of the Commissioner. *Gedatus*, 994 F.3d at 898. Courts "apply a very deferential standard of review to the ALJ's decision." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (citation and internal quotations omitted). In its "extremely limited" role, *id.*, the Court must "ensur[e] that substantial evidence supported the ALJ's decision and that the ALJ applied the correct legal standards." *Morales v. O'Malley*, 103 F.4th 469, 472 (7th Cir. 2024) (citing *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018)). "A reviewing court 'will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it.'" *Chavez v. O'Malley*, 96 F.4th 1016, 1021 (7th Cir. 2024) (alteration in original) (quoting *Gedatus*, 994 F.3d at 900). *See also Stephens*, 888 F.3d at 327 ("Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled.").

Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). "If substantial evidence supports the ALJ's conclusions, the court 'must affirm the ALJ's decision even if reasonable minds could differ about the ultimate disability finding.'" *Chavez*, 96 F.4th at 1021 (quoting *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016)).

## Discussion

On appeal before this Court is the ALJ's June 30, 2021 decision. [10-2] 1340–53. In a partially favorable decision, the ALJ found that plaintiff was not disabled prior to April 4, 2013, but became disabled on that date and continued to be disabled through the date of the decision. [*Id.*] 1352. Plaintiff now seeks review of the period from October 16, 2012[4] to April 3, 2013. [15] 2, 6.

---

[4] Plaintiff's brief at one point refers to seeking review of the period beginning on October *15*, 2012. [15] 2. Given that all other parts of plaintiff's briefing request review and reversal of the ALJ's findings for the period beginning on October 16, [*id.*] 6, 9, 10; [18] 2, 3, 5, the Court believes this October 15 instance to be a typo. *See also* [10-2] 1340, 1515.

3

Plaintiff argues that the ALJ failed to properly consider the number of work-preclusive absences plaintiff required to attend medical appointments and which accordingly impacted his ability to work during the October 16, 2012 to April 3, 2013 period. [15] 7–9. Specifically, plaintiff states that during the relevant period of time, he would have been considered absent from work for each of his fifteen weekday medical appointments. [*Id.*] 7 (citing [10-1] 306, 340–42, 343–44, 346–47, 348, 354, 355, 358, 362, 389–91, 393–94, 395–98, 422–23, 424, 485–86, 492). *See also* [15] 2–4 (summary of visits/appointments); [18] 3, 5 (plaintiff's reply summarizing that plaintiff attended fifteen medical appointments during the relevant five months and nineteen days).

The Court attempts to briefly describe each of these fifteen appointments. The first record, on October 17, 2012, documents the emergency room visit following plaintiff's feelings of neck pain and vertigo while at work. [10-1] 306. *See* [15] 2; [10-1] 51 (plaintiff's 2015 hearing testimony describing the event). The next appointment is dated the following day,[5] October 18, 2012, at 1:54 a.m. and labeled as a follow-up from the emergency room with plaintiff's primary care provider. [10-1] 395–98; [15] 3. The provider's notes stated that plaintiff was "to return after testing performed" and "off work until then," directing plaintiff to return in about one week. [10-1] 398. The next appointment is plaintiff's follow up on October 26, 2012 around 11:55 a.m. for an MRI. [*Id.*] 424, 485–86. And after that, plaintiff returned for a follow up visit on October 30, 2012 that is documented as a 2:04 a.m. office visit.[6] [*Id.*] 393–94.

The next appointment plaintiff points to is a November 12, 2012[7] appointment for a stress echocardiogram. [10-1] 362–63. The time stamp on this record is 17:16, *i.e.*, 5:16 p.m., although there is no clear indication whether this was the time of the appointment or the time the notes were entered. The next appointment is a November 20, 2012 follow up office visit with plaintiff's primary care provider with another odd time stamp (2:17 a.m.).[8] [*Id.*] 389–91. The provider's notes indicate a directive for plaintiff to return in about two weeks. [*Id.*] 392. Plaintiff then points to a November 22, 2012[9] record and states that he "underwent Holter monitoring on November 22, 2012." [15] 3, 7 n.3 (citing [10-1] 358). The record is labeled as a "Holter Monitor Report" and although the date for when the recording was initiated is November 22, the admission date is November 20 and the date of authentication by the provider is

---

[5] The record document is confusing and contains two dates/times: October 18, 2012 at 1:54 a.m. and January 23, 2014 at 8:48 p.m. [10-2] 395. However, plaintiff points to this record as from October 18, 2012 and the context of the notes in the document suggest the visit occurred immediately following plaintiff's October 17, 2012 trip to the emergency room.

[6] This record again contains confusing date/time discrepancies (October 30, 2012 at 2:04 a.m. and January 23, 2014 at 9:05 p.m.), but plaintiff offers it as a record documenting an October 30, 2012 visit. [10-1] 393.

[7] The Court notes that November 12, 2012 was a federal holiday in observance of Veterans' Day and a day off work for some employers.

[8] *See supra* nn. 5, 6.

[9] The Court notes that November 22, 2012 was Thanksgiving Day.

4

December 3. [10-1] 358–59. The Court is unable to tell whether this reflects an in-person visit.

Plaintiff next points to a handwritten progress note dated December 19, 2012 that plaintiff states is from Affiliated Mental Health. [15] 4, 7 n.3 (citing [10-1] 348). The Court cannot tell from the document itself whether there was an appointment or visit associated with these notes. Next is a mental health appointment dated both January 16, 2013 and January 22, 2013. [10-1] 346–47. Plaintiff then attended a January 29, 2013 medical appointment at 2:30 p.m. for his neck pain. [*Id.*] 422–23. On February 1, 2013, plaintiff had a medical exam appointment for a CT of his cervical spine. [*Id.*] 354–55. On February 6, 2013, plaintiff attended mental health appointments. [*Id.*] 340–42, 343–45. And plaintiff attended physical therapy sessions on February 14 and March 20, 2013. [15] 4, 7 n.3 (citing [10-1] 492).

Plaintiff points out that at the hearing, the VE testified that employers generally tolerate up to two absences in a 30-day period. [15] 7, 8 (citing [10-2] 1381–82). *See also* [18] 5 (plaintiff's reply citing the VE testimony on absences from his 2015, 2018, and 2021 hearings). Plaintiff also reasons that because the ALJ found plaintiff unable to perform his past relevant work as of October 16, 2012, then he would have hypothetically been working in a new position during the October 16, 2012 to April 3, 2013 period and therefore subject to any job's probationary period. [15] 9. Plaintiff accordingly asserts that based on the VEs' testimony at the 2015 and 2021 hearings, employers are generally stricter with absence tolerance during the probationary period and may even tolerate no absences. [*Id.*] 8–9 (citing [10-1] 84–85; [10-2] 1382).

The parties dispute whether plaintiff's challenge arises under the RFC assessment or step five of the five-step sequential evaluation process ALJs use to evaluate a claim for disability benefits. This distinction matters in determining who bears the burden of proof. The claimant bears the burden of proof at steps one through four. *Fetting*, 62 F.4th at 336 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). "At step five, the burden shifts to the agency to show that 'there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations.'" *Id.* at 336–37 (quoting *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022), citing 20 C.F.R. § 416.960(c)(2)). "The Commissioner is 'responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy.'" *Milhem v. Kijakazi*, 52 F.4th 688, 694 (7th Cir. 2022) (quoting 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2)). "Whether a claimant 'can make an adjustment to [this] other work' is determined by the ALJ based on a residual functional capacity assessment and the claimant's age, education, and work experience." *Id.* (alteration in original) (quoting 20 C.F.R. § 404.1520(a)(4)(v), 404.1520(g)(1), 416.920(a)(4)(v), 416.920(g)(1)). Plaintiff characterizes his argument for reversal as a step five issue, arguing that the ALJ did not meet her burden to establish a significant number of jobs plaintiff could perform during the relevant time

period because the ALJ failed to properly engage with the record evidence showing that the number of medical office and treatment visits plaintiff underwent would result in work preclusive absences. [15] 6–9. The Commissioner argues that this is a challenge to the RFC, which is determined between steps three and four, and cites case law demonstrating that it is a claimant who has the burden of showing excessive absenteeism or that appointments could not be arranged around a full-time work schedule. [17] 3–4 (citing cases).

Plaintiff relies on *Gajos v. Colvin* to demonstrate that this is a step five issue and the burden was on the ALJ. [15] 8; [18] 1–2. The court in *Gajos* found that "notably absent from the ALJ's opinion [was] a discussion of the VE's testimony that there would be no jobs available for a person in Plaintiff's position who missed one and a half days of work per month." *Gajos v. Colvin*, 225 F.Supp.3d 682, 694 (N.D. Ill. 2016). The court dismissed the Commissioner's argument that the plaintiff had "failed to show that she could not attend her appointments before or after work hours or on her scheduled days off work" because "the Commissioner bears the burden at Step 5 and 'must present evidence establishing that [Plaintiff] possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy.'" *Id.* at 694–95 (quoting *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011)).

From this Court's review of the case law in this circuit, *Gajos* is an outlier. The majority of courts treat absenteeism as part of the RFC assessment and accordingly falling within the claimant's burden. *See, e.g.*, *Coleen D. v. Kijakazi*, No. 21 C 1209, 2022 WL 17338277, at *4 (N.D. Ill. Nov. 30, 2022) ("When there is evidence such as this concerning absenteeism, the ALJ must explicitly consider whether Claimant's ailments caused her to miss work and, if so, how that finding affects her RFC."); *Paul M. v. Saul*, No. 19 CV 4581, 2021 WL 794981, at *6–7 (N.D. Ill. Mar. 2, 2021) (addressing claimant's claims of absenteeism due to physical therapy appointments in evaluating the RFC assessment rather than the Step 5 determination); *Chestine G. v. Saul*, No. 18 C 4980, 2020 WL 1157384, at *9 (N.D. Ill. March 10, 2020) ("Chestine argues that her medical appointments necessitated that she would consistently be absent from work more than 12-18 days per year, but she has not met her burden to show that her primary care physician appointments and physical therapy and chiropractor treatments preclude her from working."); *Tate v. Berryhill*, No. 17 C 1855, 2018 WL 688317, at *5 (N.D. Ill. Feb. 2, 2018) (finding that the ALJ erred in his RFC analysis because he failed to address some of the recommended restrictions, including "needing multiple doctors' appointments monthly due to the numerous infections from surgeries"); *Douglas J. v. Kijakazi*, No. 20-cv-03023, 2022 WL 740720, at *5 (S.D. Ind. Mar. 11, 2022) ("Because the restrictions on a claimant's ability to sustain full-time work, due to the frequency of medical visits, falls within the RFC analysis, it is the Plaintiff's burden to provide evidence to support this specific limitation."); *Jennifer W. v. Comm'r of Soc. Sec.*, No. 21-cv-04088, 2022 WL 16569580, at *5 (C.D. Ill. Sept. 30, 2022) ("It is Jennifer who fails to connect the dots

6

between her position that the evidence of absenteeism was to be included in the RFC finding and that her absenteeism would necessarily be caused by her impairments."). *See also Linda R. v. O'Malley*, No. 21 C 2068, 2024 WL 1363659, at *2 (N.D. Ill. Mar. 29, 2024) (example of a case in which the ALJ included a limitation for absences due to medical appointments in the RFC). In declining review of the ALJ's decision in this case, the Appeals Council noted that although plaintiff asserted that he "missed 15 days of work during this period, this alone does not establish disability," and treated the issue as involving the RFC assessment as well: "Although the claimant attended appointments during this timeframe, it does not necessitate greater limitations than what is assessed in the claimant's residual functional capacity." [10-2] 1328. The Court aligns with the majority and treats the question of work preclusive absenteeism due to medical appointments as falling within a claimant's burden.

    Courts also routinely find that simply having frequent documented medical appointments is insufficient to assume that those appointments will require a claimant to be absent more than employers will tolerate and accordingly be work preclusive. *See, e.g.*, *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) ("As for his doctors' appointments, Best has not shown that they would preclude him from working. . . . Best cannot point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours."); *Carolyn M. v. O'Malley*, No. 20-cv-50404, 2024 WL 2801655, at *3 (N.D. Ill. May 31, 2024) ("Other courts have subsequently followed suit, rejecting arguments and opinions as to work-preclusive absenteeism that are based on bare assertions of medical appointment needs."); *Jennifer W.*, 2022 WL 16569580, at *5 ("The ALJ did not err in failing to account for Jennifer's absenteeism in the RFC finding or in questions to the VE. The sheer number of medical visits a claimant has in a given period of time cannot suffice to show disability."); *John B. v. Kijakazi*, No. 21-cv-02012, 2022 WL 1285227, at *5 (C.D. Ill. Feb. 4, 2022) ("While Plaintiff did have 24 recorded medical appointments in under one year, that does not necessarily correlate to 24 work absences."); *Sauer v. Saul*, 2020 WL 3397406, at *17 (E.D. Wis. June 19, 2020) ("While in some cases a claimant's need for extensive treatment might preclude a regular, full-time work schedule . . . plaintiff develops no such an argument here. She relies solely on the number of appointments. That is insufficient."); *Stone v. Berryhill*, No. 17-cv-3193, 2018 WL 5300381, at *19 (C.D. Ill. Oct. 24, 2018) ("If numbers of doctors' visits alone could establish disability, claimants would only need to schedule enough visits. *See Hoppa v. Colvin*, 2013 WL 5874639, at *5 (W.D. Wis. October 31, 2013)."). The primary reason for this is the consistent recognition that although a claimant's impairments and conditions may require him or her to attend regular and/or frequent medical or treatment appointments, this does not mean that the appointments require the claimant "to miss a full day of work" or that the claimant "could not schedule his appointments outside of working hours." *Best*, 730 F. App'x at 382. *See, e.g.*, *Paul M.*, 2021 WL 794981, at *6 ("Paul never establishes that he could only attend physical therapy during work hours, or that he would need to miss full days

7

to attend such sessions."); *Chestine G.*, 2020 WL 1157384, at *9 (noting the claimant did not show "that her treatment appointments must occur during work hours"); *Rabdeau v. Kijakazi*, No. 22-CV-674, 2023 WL 5672596, at *9 (E.D. Wis. Sept. 1, 2023) ("Rabdeau points to no evidence demonstrating that her treatment appointments must occur during work hours and cannot be arranged around a traditional work schedule."); *Schwartz v. Kijakazi*, No. 22-CV-00321, 2023 WL 2728819, at *9 (E.D. Wis. Mar. 31, 2023) ("There is no reason to assume that Schwartz could not schedule doctor's appointments outside of working hours or during a lunch break."); *Star v. Kijakazi*, No. 21-CV-755, 2022 WL 4129716, at *9–10 (E.D. Wis. Sept. 12, 2022) ("Even assuming that all twenty-two appointments in 2013 were necessary, there is no reason to assume that each appointment results in one full day absent from work."); *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) ("[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment."). In *Schwartz v. Kijakazi*, for example, the claimant argued that the record evidence demonstrated he would be absent more often than any employer would tolerate because "from May 2020 to April 2021, he had an average of six medical appointments per month, and that the VE testified that most employers would *maybe* tolerate one absence per month, but not six." 2023 WL 2728819, at *9 (emphasis in original). The court nevertheless did not find the claimant's argument persuasive, concluding that there was still "a clear leap in logic here: Schwartz is operating under the assumption that each doctor's appointment results in a day absent from work." *Id.*

Plaintiff insists that his medical appointments "far exceeded any employers' late arrival, early dismissal, or absence toleration for the positions found available to him," [15] 9, and emphasizes that it was the VE who "translated the need to leave work as an absence, testifying that the need to arrive late or leave early would be defined as such." [18] 3. In the face of the extensive body of case law summarized above, the Court will not fault the ALJ for failing to explicitly articulate consideration of the VE's testimony that arriving to work late or leaving work early constitutes an absence. Plaintiff does not provide any examples of cases in which the VE testified that the definition of an "absence" includes arriving late or leaving early and the ALJ erred in failing to explicitly consider such testimony in the decision.[10] [15] 8–9; [18] 3. Nor does the VE's testimony in this case distinguish "excused" instances of leaving work early, arriving late, or leaving during the day and returning by, for example, using paid or unpaid time off. When further questioned and developed by the ALJ

---

[10] The Court's review of case law in this circuit revealed very few cases that include mention of similar VE testimony, and none offer guidance on the exact question and circumstances of the present case. *See Teske v. O'Malley*, No. 23-CV-682, 2024 WL 170127, at *6 (E.D. Wis. Jan. 16, 2024); *Ella W. v. Kijakazi*, No. 21-cv-122, 2022 WL 1421369, at *6 (N.D. Ind. May 4, 2022); *Douglas*, 2022 WL 740720, at *6–7; *Elizabeth H. v. Kijakazi*, No. 20-cv-01736, 2022 WL 1284381, at *15 (S.D. Ind. Feb. 22, 2022); *Laude v. Kijakazi*, No. 20-C-1599, 2022 WL 248264, at *11 (E.D. Wis. Jan. 27, 2022).

and the claimant's attorney, one VE provided more nuanced testimony about arriving late or leaving early from work:

> So, my testimony is that employers will generally allow one unexcused absence per month after the probationary period and that many employers do not allow any absences during the probationary period. For those individuals that do have paid time off, they may be using that paid time off for their appointments and in general, though, I go back to what I said initially, employers generally allow one absence per month. So they may allow someone to use their time off for a designated period of time if they have a lot of appointments for an illness, but if they're consistently being absent for appointments for an ongoing indefinite period of time, they've used up all of their sick leave and their vacation time, that as I mentioned the first time, that's going to be problematic.

*Douglas*, 2022 WL 740720, at *6–7. The Court also observes that the VEs' testimonies at the 2015 and 2018 hearings in this case did not include testimony that the need to arrive late or leave early constitutes an absence. [10-1] 84–85 (2015 hearing), [10-2] 1009–10 (2018 hearing).

The Court also acknowledges plaintiff's assertion that this case is distinguishable from cases in which a claim of future absenteeism for medical appointments and treatment is merely speculative. [18] 6–7. Here, the relevant timeframe is very specific and closed, so the dates of appointments are known. But there are several examples of cases in which claimants pointed to a closed period in the past and specific appointments that had occurred and the courts found this nevertheless insufficient to show the ALJ had erred in his or her analysis. *See, e.g.*, *Schwartz*, 2023 WL 2728819, at *9; *Star*, 2022 WL 4129716, at *9–10; *Sauer*, 2020 WL 3397406, at *17. And there is still an element of speculation, as plaintiff was not working during the October 16, 2012 to April 3, 2013 period and any argument as to how such appointments could have coexisted with a full time work schedule is speculation:

> The ALJ is not required to speculate. Stone is speculating on what she would have done had she been working. If Stone had been working, she might have scheduled her medical appointments on her days off or combined appointments. No one knows. No one knows because this argument is all speculation. The ALJ did not err in omitting such speculation from her decision.

*Stone*, 2018 WL 5300381, at *19.

Of course, if an ALJ assesses a claimant's absenteeism and finds that it is a limitation warranting inclusion in the RFC, failure to consider the VE's testimony

9

about tolerated absences would be error potentially requiring remand. But here, the ALJ's decision did mention consideration of plaintiff's absences from work due to medical appointments and found it unpersuasive: "While the claimant did have appointments and therapy, there was no requirement they be during work hours. Thus the representative's argument that he would miss days of work is without merit." [10-2] 1348. *See also Hicks v. Colvin*, No. 13 CV 4817, 2015 WL 3463406, at \*5 (May 29, 2015) ("[N]either Hicks nor the Commissioner cite to any case law from this circuit or elsewhere discussing the need for frequent medical treatment as a factor in an ALJ's disability analysis."). Plaintiff is correct that it was the ALJ's burden to establish significant numbers of jobs in the national economy that plaintiff could perform considering the limiting effects of his impairments. [15] 6–7. But the ALJ found that plaintiff's absenteeism was *not* a limiting effect of his impairments and therefore did not ultimately include it in the RFC. As such, it was not necessary for the ALJ's decision to specifically mention the VE's testimony on absenteeism. *Gribben v. Kijakazi*, No. 21-1987, 2022 WL 59404, at \*2 (7th Cir. Jan. 6, 2022) (finding that the ALJ did not impermissibly ignore an opinion of the VE where the ALJ found claimant did not require the particular restriction and the VE's statement was thus not relevant).

Furthermore, as defendant argues, [17] 2–3, plaintiff does not point to any opinion evidence in the record opining that plaintiff's impairments caused restrictions related to absenteeism or work-preclusive absences due to medical appointments and treatment. *Hicks*, 2015 WL 3463406, at \*5 ("[N]one of Hicks's physicians, not even Dr. Shapiro, rendered any medical opinion about required absences tied to Hicks's condition. Accordingly, this court cannot fault the ALJ, who is not a doctor, for declining to make a finding that the three physicians, including a testifying medical expert, also declined to make."). *Cf. Hawist v. Berryhill*, No. 17 CV 50126, 2018 WL 6399094, at \*4 (N.D. Ill. Dec. 6, 2018); *Tate*, 2018 WL 688317, at \*5. Having a "distinct medical opinion" in the record "regarding absenteeism is distinguishable from simply having many documented appointments." *John B.*, 2022 WL 1285227, at \*5. If the record contained opinion evidence restricting plaintiff's ability to engage in gainful employment due to absences for medical/treatment appointments, then failing to assess that opinion and the VE's corresponding favorable testimony would be reversible error. *Dennis S. v. Kijakazi*, No. 19 CV 2245, 2022 WL 425715, at \*7–8 (N.D. Ill. Feb. 10, 2022). But that is not the case here and not what plaintiff alleges.

In its "extremely limited" role to apply a "very deferential standard of review to the ALJ's decision," *Jarnutowski*, 48 F.4th at 773, the Court is persuaded that the ALJ supported the decision with substantial evidence and applied the correct legal standards. *Morales*, 103 F.4th at 472. As the Court is denying plaintiff's motion and affirming the ALJ's decision, the Court need not address plaintiff's additional argument for reversal with an award of benefits rather than remand. [15] 9–10.

10

## Conclusion

For the foregoing reasons, plaintiff's request to reverse the SSA's decision [15] is denied and defendant's motion for summary judgment [16] is granted, and the decision denying the application for benefits for the period of October 16, 2012, to April 3, 2013, is affirmed.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 24, 2025**